[Cite as *State v. Yob*, 2025-Ohio-4919.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO,<br><br>    Plaintiff - Appellee<br><br>-vs-<br><br>ZACHARY YOB,<br><br>    Defendant – Appellant | Case No. 2024CA00194<br><br>Opinion And Judgment Entry<br><br>Appeal from the Stark County Court of Common Pleas, Case No. 2024-CR-1092<br><br>Judgment:   Affirmed<br><br>Date of Judgment Entry: October 27, 2025 |

**BEFORE:** Craig R. Baldwin; Andrew J. King; Kevin W. Popham, Appellate Judges

**APPEARANCES:** KYLE L. STONE, Prosecuting Attorney, CHRISTOPHER A. PIEKARSKI, Assistant Prosecuting Attorney, for Plaintiff-Appellee; AARON KOVALCHIK, for Defendant-Appellant.

*Baldwin, P.J.*

{¶1} The appellant, Zachary Yob, appeals the jury's verdict finding him guilty on two counts of sexual battery. Appellee is the State of Ohio.

**STATEMENT OF FACTS AND THE CASE**

{¶2} The parents of victim H.B. are separated and live in separate households. H.B. lived primarily with her father, but also spent time at her mother's home. The appellant was the mother's on-again/off again boyfriend for approximately three years prior to the August, 2023, incident giving rise to this case. By August 24, 2023, the appellant had been living at mother's home for several months.

{¶3} On August 24, 2023, H.B. was at her mother's home, alone with the appellant. After consuming Mike's Hard Lemonade and Fireball Whiskey, and possibly

marijuana via the appellant's vape pen, H.B. ran to the bathroom and threw up. The appellant helped H.B. to her bedroom. H.B. subsequently threw up again, this time in her bed. The appellant then helped H.B. to his and H.B.'s mother's bed.

{¶4}    H.B. awoke to the appellant in bed with her, his penis inside of her. She told the appellant that what he was doing was wrong, and asked him to stop. The appellant continued until H.B. faked an orgasm, then he rolled off of her. H.B. immediately grabbed her things and left her mother's home. She went directly to her best friend A.S.'s home and told her what happened.  A.S. advised H.B. to go to work and tell an adult what had happened. H.B. went to work and told her boss what had happened; he told her to tell her father, report the incident to the police, and get a "rape kit" done at the hospital, which H.B. did later that same day.

{¶5}    On June 13, 2024, the appellant was indicted on the following: Count One, sexual battery in violation of R.C. 2907.03(A)(2)(B); and, Count Two, sexual battery in violation of R.C. 2907.03(A)(5)(B), both felonies of the third degree. The appellant pleaded not guilty to both counts. The matter went to jury trial on October 30 – 31, 2024, after which the jury found the appellant guilty on both counts. The trial court merged Count Two with Count One for purposes of sentencing, sentenced the appellant to a definite term of sixty months in prison, and classified him as a Tier III sex offender. The appellant filed a timely appeal, and sets forth the following two assignments of error:

{¶6}    "I. APPELLANT'S CONVICTION FOR SEXUAL BATTERY UNDER RC 2907.03(A)(2)(B) WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**{¶7}** "II. APPELLANT'S CONVICTION FOR SEXUAL BATTERY UNDER RC 2907.03(A\(5)(B) WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

**{¶8}** For the reasons set forth below, we find the appellant's assignments of error to be without merit, and affirm the decision of the trial court. [1]

## STANDARD OF REVIEW

**{¶9}** The appellant challenges his convictions on both manifest weight and sufficiency of the evidence grounds. Manifest weight of the evidence addresses the evidence's effect of inducing belief. *State v. Thompkins,* 78 Ohio St.3d 380, 386–387 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith,* 1997–Ohio–355. The *Thompkins* Court stated:

> Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*." (Emphasis added.) Black's, *supra,* at 1594.

*Id.* at 387. The Court stated further:

---

[1] We note that Count Two was merged with Count One for purposes of sentencing, and that the appellant was sentenced on Count One only.

When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a " 'thirteenth juror' " and disagrees with the factfinder's resolution of the conflicting testimony. *Tibbs,* 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. See, also, *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720–721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.").

*Id.*

{¶10} In addition, "* * * [I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *

"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

{¶11} Sufficiency of the evidence involves a different analysis, and was addressed by the Ohio Supreme Court in *State v. Worley,* 2021-Ohio-2207, as follows:

> The test for sufficiency of the evidence is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, 684 N.E.2d 668 (1997), fn. 4, and following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). " 'Proof beyond a reasonable doubt' is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs." R.C. 2901.05(E). A sufficiency-of-the-evidence challenge asks whether the evidence adduced at trial "is legally sufficient to support the jury verdict as a matter of law." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 219.

*Id.* at ¶57. Thus, a review of the constitutional sufficiency of evidence to support a criminal conviction requires a court of appeals to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

### Assignment Of Error I

{¶12} The appellant submits in his first assignment of error that his conviction for sexual battery under R.C. 2907.03(A)(2) - that is, that he knew H.B.'s ability to appraise

the nature of or control her own conduct was substantially impaired - was against the manifest weight of the evidence. We disagree.

**Analysis**

**{¶13}** R.C. 2907.03(A)(2) provides that "[n]o person shall engage in sexual activity with another; cause another to engage in sexual activity with the offender; or cause two or more other persons to engage in sexual activity when . . . [t]he offender knows that the other person's, or one of the other persons', ability to appraise the nature of or control the other person's own conduct is substantially impaired."

**{¶14}** The issue of substantial impairment was discussed by the court in *State v. Samamra,* 2025-Ohio-126 (9th Dist.):

"Substantial impairment" is not defined for purposes of this statute. However, in *State v. Jordan*, 174 Ohio St.3d 347, 2023-Ohio-3800, 237 N.E.3d 58, ¶ 22, the Supreme Court of Ohio defined these terms as follows:

"Substantially" has been defined as "in a substantial manner" or "so as to be substantial." Webster's Third New International Dictionary 2280 (2002). To better understand these definitions, we examine the word "substantial," which means "constituting substance" or "not seeming or imaginary." *Id.* "Impaired" means "to make worse" or "diminish in quantity, value, excellence, or strength." *Id.* at 1131.

Prior to *Jordan*, this Court gave the following guidance in determining whether an individual is substantially impaired in the context of intoxication:

With respect to R.C. 2907.01(A)(1)(c), this Court has recognized that voluntary intoxication is a mental or physical condition that could cause substantial impairment. Nonetheless, this Court agrees that "[e]very alcohol consumption does not lead to a substantial impairment." In addition, we cannot say that every instance of intoxication equates with substantial impairment. "[W]hen reviewing substantial impairment due to voluntary intoxication, there can be a fine, fuzzy, and subjective line between intoxication and impairment." "Additionally, the waters become even murkier when reviewing whether the defendant knew, or should have known, that someone was impaired rather than merely intoxicated."

(Internal citations and quotations omitted.) *State v. Hansing*, 2019-Ohio-739, 132 N.E.3d 252, ¶ 14 (9th Dist.).

In order to prove sexual battery under R.C. 2907.03(A)(2), the State must establish both that the accuser was substantially impaired *and* that the offender knew or had cause to reasonably believe the accuser was substantially impaired. *State v. Rivera*, 2012-Ohio-2060, 2012 WL 1649801, ¶ 20 (8th Dist.); *State v. Doss*, 2008-Ohio-449, 2008 WL 323168, ¶ 25 (8th Dist.). Mr. Samamra argues that the State failed to present sufficient evidence that the victim, M.Y., was substantially impaired and that he knew or had cause to reasonably believe M.Y. was substantially impaired. He does not contest the other elements of the offense.

*Id.* at ¶¶ 10-12. Similarly, the appellant herein contests only the substantial impairment element of his conviction under R.C. 2907.03(A)(2)(B).

**{¶15}** The following evidence of H.B.'s substantial impairment, and the appellant's awareness thereof, was presented at trial. H.B. testified that she drove the appellant to a convenience store and waited in the car while he went inside and bought a case of beer and a pack of Fireball shots. The two returned to H.B.'s mother's home, where the appellant also lived. The two went upstairs, started drinking, and H.B. gave the appellant a Tarot card reading, which was common. H.B. drank a Mike's Hard Lemonade from the refrigerator, and two or three Fireball shots. The appellant also had marijuana in the house; H.B. could not recall if the appellant gave her any that night, but testified that it was possible. H.B. and the appellant talked and opened up to each other, and H.B. became upset and emotional because they were discussing her PTSD. H.B. testified that she was "not [herself]" because she was drinking. She was "very in and out of it" from the alcohol, and she eventually went to the bathroom to vomit. She testified that the believed the mixture of being intoxicated, upset, and overwhelmed from her PTSD caused her to get sick.

**{¶16}** H.B. testified that the appellant followed her into the bathroom, then went downstairs to get her some water. H.B. eventually went to her bedroom to lie down, and the appellant returned to his and H.B.'s mother's bedroom. However, H.B. vomited again, this time in her bed. She testified that the appellant returned to her bedroom, saw that she had vomited in her bed, helped her up, and guided her into his and H.B.'s mother's bedroom, telling H.B. to lie down and to drink some more water. H.B. testified that she then fell asleep. She testified that she awoke sometime between 4:30 a.m. and 6:00 a.m.

with the appellant's penis already inside her vagina. She was not aware of what was going on around her until she woke up and realized what was happening. She testified that her pants were off, her underwear was pulled to the side, and her shirt was rolled up. She recalled still feeling intoxicated and that she was "definitely was not in the right state of mind." She was still trying to process everything, but she remembered telling the appellant: "[W]hat the hell are you doing?"; "Get off of me"; "No"; and then repeating, "[N]o, what are you doing?" She testified that the appellant did not respond or react to any of her pleas.

{¶17} Once the appellant "finished," H.B. testified that she gathered her things and left her mother's home. She immediately contacted her best friend, A.S. H.B. went straight A.S.'s house and told A.S. what happened. A.S. also testified at trial, and her testimony supported H.B.'s testimony.

{¶18} In addition, the appellant and H.B. exchanged text messages following the incident in which the appellant stated "I shouldn't have let you drink more when I knew you were already trashed you're right," and "I shouldn't have let you hit the vape you're right I'm a bad influence I should be more of a grown ass adult you're right."  The full transcript of all said text messages were admitted into evidence.

{¶19} The appellant testified that the sexual encounter with H.B. was consensual, and that he was unaware of her substantial impairment. He argues that H.B.'s testimony was inconsistent and lacking in credibility, and that the jury's verdict finding him guilty of sexual battery due to H.B.'s substantial impairment is against the manifest weight of the evidence.

**{¶20}** This Court has consistently found that the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. Furthermore, the trier of fact "'has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page.' *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 1997–Ohio–260, 674 N.E.2d 1159." *State v. Schoeneman,* 2017-Ohio-7472, ¶23 (5th Dist.).

**{¶21}** After a thorough review of the entire record, we conclude that this is not an exceptional case in which the jury clearly lost its way and created a manifest miscarriage of justice requiring a reversal of the appellant's conviction for sexual battery based upon H.B.'s substantial impairment. As such, the appellant's first assignment of error is overruled.

### Assignment Of Error II

**{¶22}** The appellant submits in his second assignment of error that his conviction for sexual battery under R.C. 2907.03(A)(5) - that is, that he was a person in loco parentis of H.B. at the time he committed the offense - was against the manifest weight of the evidence and the sufficiency of the evidence. We disagree.

### Analysis

**{¶23}** R.C. 2907.03(A)(5) provides that "[n]o person shall engage in sexual activity with another; cause another to engage in sexual activity with the offender; or cause two or more other persons to engage in sexual activity when . . . [t]he offender is . . . in loco parentis of the other person."

**{¶24}** The issue of in loco parentis was discussed by this Court in *State v. Hane,* 2025-Ohio-120 (5th Dist.):

. . . The term "in loco parentis" means "charged, factitiously, with a parent's rights, duties, and responsibilities;" a person in loco parentis has assumed the same duties as a guardian or custodian, only not through a legal proceeding. *In re K.K.E.*, 2020-Ohio-6723, 2020 WL 7385292, ¶ 17 (5th Dist.), citing *State v. Noggle*, 67 Ohio St.3d 31, 1993-Ohio-189, 615 N.E.2d 1040, superseded on other grounds.

*Id.* at ¶23.

**{¶25}** The definition of in loco parentis was described by the court in *State v. Burgett,* 2009-Ohio-5278 (3rd Dist.) as follows:

. . . In order to meet the definition of in loco parentis, a person must not only assume a dominant parental role, but must also be relied upon by the child for support. *State v. Stout,* 3d Dist. No. 8–07–12, 2008–Ohio–161, ¶ 15, citing *Noggle,* 67 Ohio St.3d 31, 615 N.E.2d 1040. Furthermore, "[t]he key factors of an in loco parentis relationship have been delineated as 'the intentional assumption of obligations incidental to the parental relationship, especially support and maintenance.' " *Evans v. The Ohio State Univ.* (1996), 112 Ohio App.3d 724, 736, 680 N.E.2d 161, quoting *Nova Univ., Inc. v. Wagner* (Fl.1986), 491 So.2d 1116, 1118, fn. 2.

*Id.* at ¶23.

**{¶26}** Moreover, the court in *State v. Abubakar*, 2011-Ohio-6299 (10th Dist.) recognized that the term in loco parentis can involve more than simply financial support:

. . . A close, supportive, and protective in loco parentis relationship need not include provision for the material needs of the child. *Id.* at ¶ 70,

615 N.E.2d 1040. The offices and duties of a parent are infinitely various. *Id.* Some have no connection whatsoever with providing for the child; and many of the benefits of such a relationship, under given circumstances, would be much more important than the making of such provision. This court also noted that numerous federal authorities have concluded that the assumption of the in loco parentis relationship is primarily a question of intention, which is shown by the acts, conduct, and declaration of the person allegedly standing in that relationship. (Citations omitted.)

*Id.* at ¶ 10.

{¶27} In the case sub judice, the evidence presented during trial established that the appellant had been with H.B.'s mother off and on for a number of years, had moved into H.B.'s mother's home a few months prior to the incident, and helped H.B.'s mother pay the mortgage on the home. H.B. had her own room at her mother's home, and "just kind of flipped between the two houses of wherever [she] wanted to who [she] wanted to see [sic]." H.B. had known the appellant for approximately three years prior to the incident, talked with him whenever they were around the house together, and viewed him as "a trustable [sic] adult that [she] was able to go to for advice, things like that." For example, H.B. struggled with PTSD arising from an abusive relationship with a horse trainer when she was younger, and testified that she trusted the appellant and spoke with him about her PTSD issues. The appellant sometimes gave H.B. cash when she was short on money for something, or if she was "running to go get snacks." H.B. testified that although the appellant did not discipline her directly, he would "chime in" with her mother when her

mother disciplined her, and would "talk with her about it." H.B. testified that she saw the appellant as a "father figure," and testified further:

> BY H.B.: The only thing that stops me from considering him a father is because I have such a great father in my life. I was blessed with a great dad so I would never call somebody else my father. [The appellant] was a very trustworthy person that I confided in a lot, and he was somebody that I looked to and he was playing the father role in the house. He was the man of the house.

**{¶28}** The appellant testified that H.B. sought advice from him regarding issues associated with her PTSD arising from the abuse she experienced with her horse trainer, and that they spoke about said issues on more than one occasion. The appellant testified that on the night in question H.B. stopped by and sought his advice regarding events that had occurred earlier in the week, then left to take food to her sister at their father's home. The appellant testified further that he called H.B. around 9:45 "to kind of check on her to make sure either what was going on [sic], whether she was staying at dad's house, if she was okay…." The appellant testified that after H.B. returned they began to have a conversation regarding what was bothering H.B. The appellant testified that "…I just kind of wanted to be a listening ear for her just to kind of, you know, help her through her own stuff." On cross examination the appellant agreed that he wanted to see H.B. succeed just like he wanted to see his son succeed.

**{¶29}** After viewing the evidence in the light most favorable to the prosecution, we cannot say that no rational trier of fact could have found the in loco parentis element of the second sexual battery charge beyond a reasonable doubt. Nor can we say that, after

making every reasonable intendment and every reasonable presumption in favor of the judgment and the finding of facts, that the jury lost its way such that a manifest miscarriage of justice has occurred regarding the in loco parentis element of the second sexual battery charge. The appellant's second assignment of error is, therefore, overruled.

## CONCLUSION

**{¶30}** Based upon the foregoing, we find that the appellant's conviction on the charge of sexual battery based upon substantial impairment was not against the manifest weight of the evidence. We further find that the appellant's conviction on the charge of sexual battery based upon in loco parentis was not against the manifest weight of the evidence, and was supported by sufficient evidence. Accordingly, the appellant's assignments of error numbers one and two are overruled, and the decision of the Stark County Court of Common Pleas is hereby affirmed.

**{¶31}** Costs to appellant.

By: Baldwin, P.J.

King, J. and

Popham, J. concur.